# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO
### LEWIS T. BABCOCK, JUDGE

Civil Case No. 06-cv-02257-LTB-MJW

PAUL ALUDO,

      Plaintiff,

v.

DENVER AREA COUNCIL, BOY SCOUTS OF AMERICA,
and
BOY SCOUTS OF AMERICA, NATIONAL COUNCIL,

      Defendants.

_____

# ORDER
_____

This employment discrimination case is before me on Defendant, Boy Scouts of America, National Council's, ("BSA"), Motion for Summary Judgment and supporting Brief [**Docket ## 60, 61**], Plaintiff, Paul Aludo's, Response [**Docket # 106**] and BSA's Reply [**Docket # 111**]. Oral argument on the present motion was held on July 25, 2008. After consideration of the arguments made at the July 25, 2008, hearing, the motion, the papers, and the case file, and for the reasons stated below, I GRANT BSA's Motion for Summary Judgment [**Docket # 60**].

## I. BACKGROUND

The alleged relevant facts are as follows. Plaintiff is African-American and over the age of 40. Plaintiff was hired by BSA in February 1986 and began working for the Denver Area Council ("DAC") in January 1994. At the time of his termination, Plaintiff was employed as a Field Director.

On or shortly after March 11, 2005, Plaintiff was advised by the Scout Executive of the

DAC—Mr. Hermann—that Plaintiff's current position as Field Director was being eliminated due to budgetary restrictions and reorganization and that his employment was terminated. Also on March 11, 2005, a white employee under age 40 was promoted to Assistant Director of Field Service, a newly created position, and another a white employee under age 40 was promoted to Field Director. No other employees of DAC were laid off as part of the reorganization or budgetary restrictions, although some apparently resigned their positions voluntarily. On April 1, 2005, a white former employee was hired as the Director of Finance Service. Plaintiff claims he was not considered for this position despite being qualified.

Plaintiff claims he would have been eligible for health and retirement benefits if he had remained in Defendants' employ through February 2006—his 20-year employment anniversary. Plaintiff claims he was illegally terminated or passed over for promotion based on his race/color/national origin, age, and seniority.

On or about April 15, 2005, DAC was placed on notice that Plaintiff believed he had been illegally terminated due to his race/color/national origin, age, and seniority. Plaintiff claims additional positions became available within DAC after his termination, but he was not considered for those positions—although he maintains he was qualified—in retaliation for his decision to pursue his discrimination claims. Plaintiff also claims he applied for positions with other Area Councils in other cities, but was not offered the positions in retaliation or because of his race/color/national origin and age.

Plaintiff filed a complaint on November 9, 2006, claiming: (1) race and national origin discrimination in termination, in violation of Title VII; (2) race and national origin discrimination in termination, in violation of 42 U.S.C. § 1981; (3) age discrimination in

2

termination, in violation of the ADEA; (4) retaliation in violation of Title VII; (5) retaliation in violation of 42 U.S.C. § 1981; (6) retaliation in violation of the ADEA; and (7) ERISA "retaliation"—which is in actuality a misnomered wrongful termination claim—for terminating Plaintiff before his 20-year benefits package became active.

## II. PRESENT MOTION

BSA filed the present motion for summary judgment on March 12, 2008 [**Docket # 60**]. BSA argues it was DAC that terminated Plaintiff's employment and that BSA cannot be held liable for the actions of DAC—a separately incorporated entity. Thus, BSA asserts Plaintiff's termination-related claims—Claims One, Two, Three, and Seven—must be dismissed as against BSA.

BSA next argues there is no evidence that BSA took any adverse action against Plaintiff with the intent to retaliate. BSA also argues Plaintiff is unable to show he was qualified for a job for which he was rejected and a less-qualified candidate was hired and any retaliation claims against BSA would be improper because BSA does not make hiring decisions. Thus, BSA argues Plaintiff's retaliation-related claims—Claims Four, Five, and Six—should also be dismissed as against BSA.

Regarding his termination claims, Plaintiff responds [**Docket # 106**] that BSA controlled the day-to-day operations of DAC to such a degree that BSA and DAC should be considered a single or joint employer. Evidence of this "control" includes: (1) BSA issued a set of guidelines—called the "Briefcase"—to local councils to assist in formulating personnel practices and procedures; (2) local councils agreed to abide by BSA policies and procedures in exchange for their charter; (3) BSA must approve the hiring of any person at the executive level—called a

"commissioned professional"—and any such commissioned professional must undergo BSA training; (4) BSA assists with the placement of commissioned professionals; (5) BSA controls which commissioned professionals may apply for a given job with a local council; (6) BSA assists DAC with fundraising; and (7) BSA administers a benefits package that is available to and used by most local councils. Plaintiff also argues BSA was required to approve the elimination of Plaintiff's position, although he acknowledges that no evidence exists to show BSA's approval was ever actually sought.

Regarding his retaliation claims, Plaintiff argues BSA intentionally did not act aggressively enough to try and secure him a new position with another local council after his employment with DAC had been terminated. Under BSA policy, a commissioned professional who seeks placement with a different local council almost always submits an application to BSA which then acts as a clearinghouse. Plaintiff claims BSA typically will assist a terminated employee for 4 to 6 months, but BSA only assisted Plaintiff for 3 to 4 months. Plaintiff also claims BSA only sent his application materials to five local councils, and that BSA did not work in conjunction with DAC to place Plaintiff in the new positions that became available within DAC after Plaintiff's termination.

Regarding Plaintiff's termination claims, BSA replies [**Docket # 111**] that the Briefcase is only a set of guidelines and shows no actual control on the part of BSA of local councils' day-to-day activities. Moreover, the language of the Briefcase specifically states it is to be considered advisory and non-binding in nature and no evidence—either documentary or testimonial—suggests otherwise. Likewise, no evidence shows the Briefcase—even if it was binding in nature—is used in practice to dictate local council policy. Further, no evidence shows

BSA—by means of the Briefcase or any other procedure or practice—in any way affected DAC's decision to terminate Plaintiff's employment.

Regarding Plaintiff's retaliation claims, BSA notes that Plaintiff fails to allege BSA's actions were motivated or caused by retaliatory animus. BSA also argues Plaintiff has not shown an adverse employment action caused by BSA. Regarding the positions that became available with DAC, BSA states Plaintiff was informed by BSA—in accord with BSA and DAC's normal policies—that he should speak directly with DAC regarding any positions with that council. Regarding the other positions, BSA argues it had no authority to place Plaintiff with other councils, but only served as an intermediary to forward Plaintiff's application to local councils that were hiring for a position for which Plaintiff was qualified. Although Plaintiff claims BSA did not act vigorously enough to ensure he was hired by another local council, BSA argues Plaintiff has not shown BSA acted towards him any differently than towards other commissioned professionals in his position and provides no evidence showing that sending his application to "only" five local councils was less than normal. BSA argues the evidence shows BSA's actions on Plaintiff's behalf were, in fact, more aggressive than normal.

### III.  STANDARD OF REVIEW

The purpose of a summary judgment motion is to assess whether trial is necessary. *White v. York Int'l Corp.*, 45 F.3d 357, 360 (10th Cir. 1995). If a reasonable juror could not return a verdict for the non-moving party, summary judgment is proper and there is no need for a trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Summary judgment is not proper if—viewing the evidence in the light most favorable to the non-moving party and drawing all reasonable inferences in that party's favor—a reasonable jury could return a verdict for the non-

moving party.  *Mares v. ConAgra Poultry Co., Inc.*, 971 F.2d 492, 494 (10th Cir. 1992).

In a motion for summary judgment, the moving party "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact."  *Celotex*, *supra*, 477 U.S. at 323 (quoting FED. R. CIV. P. 56(c)).  If this burden is met, then the non-moving party has the burden of showing there are genuine issues of material fact to be determined.  *See id.* at 322.  It is not enough that the evidence be merely colorable; the non-moving party must come forward with specific facts showing a genuine issue for trial.  *See id.*; *Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  A fact is material if it might affect the outcome of the suit under the governing substantive law.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).  I shall grant summary judgment, therefore, only if the pleadings, depositions, answers to interrogatories, admissions, or affidavits show there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  *Lucas v. Mountain States Tel. & Tel.*, 909 F.2d 419, 420 (10th Cir. 1990); FED. R. CIV. P. 56(c).

In a motion for summary judgment, I view the evidence "through the prism of the substantive evidentiary burden."  *Liberty Lobby*, *supra*, 477 U.S. at 254.  The inquiry is based on "the quality and quantity of evidence required by the governing law" and "the criteria governing what evidence would enable the jury to find for either the plaintiff or the defendant."  *Id.* Accordingly, in this employment discrimination case, Plaintiff must show material facts in dispute by a preponderance of the evidence in order to defeat BSA's motion for summary

judgment.  Plaintiff meets this burden if he sets forth evidence that—if believed by the ultimate factfinder—makes the question of BSA's wrongdoing more likely than not.

## IV.  DISCUSSION

Plaintiff's claims fall into two general categories: wrongful termination (Claims 1, 2, 3, and 7) and retaliation (Claims 4, 5, and 6).  BSA, in turn, asserts two theories under which summary judgment is appropriate: BSA is a distinct entity from DAC and played no role in Plaintiff's termination; and BSA neither retaliated directly nor participated in the allegedly retaliatory hiring decisions of the various local councils, including DAC.

### A.  Termination Claims

BSA asserts it cannot be held liable for DAC's allegedly wrongful termination of Plaintiff because DAC—as well as every other local council—is a separately incorporated entity from BSA and is solely responsible for its own operations.  *See Frank v. U.S. West, Inc.*, 3 F.3d 1357, 1362 (10th Cir. 1993) ("The law allows businesses to limit liability and isolate liabilities among separate entities.").  "The doctrine of limited liability creates a strong presumption that a parent company is not the employer of its subsidiary's employees, and the courts have found otherwise only in extraordinary circumstances." *Id*.

Plaintiff responds that BSA and DAC are interrelated to such a degree that it would be appropriate to hold BSA liable for DAC's actions under the single-employer test or the joint-employer test.  "Although these tests are sometimes confused, they differ in that the single-employer test asks whether two nominally separate entities should in fact be treated as an integrated enterprise, while the joint-employer test assumes that the alleged employers are separate entities."  *Bristol v. Bd. of County Comm'rs of County of Clear Creek*, 312 F.3d 1213,

1217 (10th Cir. 2002).

### 1. Single-employer test

"Underlying the single employer test is the requirement 'that there be sufficient indicia of an interrelationship between the immediate corporate employer and the affiliated corporation to justify the belief on the part of an aggrieved employee that the affiliated corporation is jointly responsible for the acts of the immediate employer.'" *Lockard v. Pizza Hut, Inc.*, 162 F.3d 1062, 1070 (10th Cir. 1998) (quoting *Armbruster v. Quinn*, 711 F.2d 1332, 1337 (6th Cir. 1983)). "[T]he heart of the enquiry is whether there is an absence of an arm's-length relationship among the companies." *Knowlton v. Teltrust Phones, Inc.*, 189 F.3d 1177, 1184 (10th Cir. 1999).

The standard to be employed when determining whether consolidation of two legally-separate entities—such as BSA and DAC—is proper under the single-employer test is the standard promulgated by the National Labor Relations Board and considers four factors: (1) interrelation of operations; (2) common management; (3) centralized control of labor relations; and (4) common ownership or financial control. *See Bristol*, *supra*, 312 F.3d at 1220; *Baker v. Stuart Broadcasting Co.*, 560 F.2d 389, 392 (10th Cir. 1977). No one of these factors is controlling, but courts "generally consider the third factor—centralized control of labor relations—to be the most important." *See Bristol*, 312 F.3d at 1220; *Baker*, 560 F.2d at 392. "The critical question is, '[w]hat entity made the final decisions regarding employment matters related to the person claiming discrimination?'" *Frank*, *supra*, 3 F.3d at 1363 (quoting *Trevino v. Celanese Corp.*, 701 F.2d 397, 404 (5th Cir. 1983)). A parent company's broad policy statements regarding employment matters is insufficient to show control of labor relations; what must be shown is control of the day-to-day employment decisions of the subsidiary. *Frank*, 3

8

F.3d at 1363. "A parent company is the employer of a subsidiary's personnel only if it controls the subsidiary's employment decisions or so completely dominates the subsidiary that the two corporations are the same entity." *Johnson v. Flowers Indus., Inc.*, 814 F.2d 978, 980 (4th Cir. 1987).

Plaintiff argues BSA controlled day-to-day employment decisions of DAC. Primarily, Plaintiff relies on the existence of the Briefcase—"a set of guidelines to provide local council Scout executives assistance in personnel matters [and] procedures." *See* Chandler Depo. 45–46 [**Docket # 106-4**]. Plaintiff's evidence, however, shows that "the details of those various policies" are determined by local executives, not BSA. *See* Morin Depo. 38–39 [**Docket # 106-9**]. The Briefcase is treated by local councils as "guidelines for the councils to follow to help make them . . . more aware of a proper verbiage and process to follow in certain situations." *See* Rankin Depo. 88–89 [**Docket # 106-10**]. These "guidelines" are not mandatory, but are issued for the purpose of "helping [a local] council wade through the morass of employment law and employment practices . . . if they choose to follow" them. *See* Chandler Depo. 63–64 [**Docket # 106-4**]. Moreover, the Briefcase itself states: "The responsibility for ensuring effective management and legal compliance, however, always rests with the local council as the actual employer, because all paid staff members of a local council—whether commissioned professional or any other category—are solely the employees of the local council, which is responsible for the day-to-day directing and administrative control of these individuals." *Introduction to the Briefcase* 1 [**Docket # 106-12**].

The evidence proffered by Plaintiff fails to show BSA's regulation of DAC—as expressed in the Briefcase—goes beyond a broad general policy statement or an "arm's-length

relationship." *Knowlton*, *supra*, 189 F.3d at 1184; *Frank*, *supra*, 3 F.3d at 1363. Although Plaintiff argues the facts here are similar to those in *Baker*, this is simply not so. In *Baker*, both businesses were owned by the same individuals, both businesses had the same president, and the "parent" business provided management services for the "subsidiary" including paying the subsidiary's bills and applying for licenses on the subsidiary's behalf. Although the parent company in *Baker*—ostensibly like BSA here—issued policy manuals that the subsidiary was required to follow, the Tenth Circuit did not rely on this fact in reaching its holding, instead noting that the two businesses "share[d] management and ownership" and had "sufficient interrelation of operations." *Baker*, *supra*, 560 F.2d at 392. Here, there is no evidence presented that shows shared management or ownership or any interrelation of operations. To the extent BSA issues a policy manual that DAC is required to follow—a factual allegation that does not appear to be supported by the evidence presented, even when construed in the light most favorable to Plaintiff—there is no case law showing this to be sufficient to support consolidation of BSA and DAC for purposes of Plaintiff's termination claims. Accordingly, the proffered evidence regarding the Briefcase fails to create a material factual dispute with regard to the control prong. *Frank*, *supra*, 3 F.3d at 1363.

Plaintiff also proffers evidence showing BSA exerted control over the hiring and promotion process for commissioned professionals in that BSA only allowed local councils to hire from a pre-approved list of applicants. Plaintiff's claims, however, do not involve a failure to hire or promote, but rather wrongful termination. BSA's alleged control of DAC's ability to hire commissioned professionals does not create a material factual dispute as to Plaintiff's termination claims. *See Trevino v. Celanese Corp.*, 701 F.2d 397, 403–05 (1st Cir. 1983)

(holding application of the single-employer test must consider whether the two entities acted as a single employer with regard to the adverse employment action alleged).

Plaintiff's arguments regarding BSA's alleged financial control of DAC's operations are likewise unpersuasive. Plaintiff does not put forth any evidence showing BSA "controlled" DAC's finances in any way. Even when construed in the light most favorable to Plaintiff, the evidence presented merely shows BSA provided guidance and assistance to DAC for the purpose of ensuring DAC was able to meet budgetary constraints on a year-to-year basis. This is insufficient to show the type of financial control that would make the two separate companies a single employer. *See Evans v. McDonald's Corp.*, 936 F.2d 1087, 1090 (10th Cir. 1991); *Burdi v. Uniglobe Cihak Travel, Inc.*, 932 F. Supp. 1044, 1048 (N.D. Ill. 1996); *Webb v. Am. Red Cross*, 652 F. Supp. 917, 921–22 (D. Neb. 1986).

Accordingly, I agree with BSA that Plaintiff fails to show a material question of fact exists as to whether BSA and DAC should be considered a single employer for purposes of Plaintiff's termination claims.

### 2. Joint-employer test

"Courts applying the joint-employer test treat independent entities as joint employers if the entities 'share or co-determine those matters governing the essential terms and conditions of employment.' In other words, courts look to whether both entities 'exercise significant control over the same employees.'" *Bristol*, *supra*, 312 F.3d at 1218 (quoting *Virgo v. Riviera Beach Assocs., Ltd.*, 30 F.3d 1350, 1360 (11th Cir. 1994); *Graves v. Lowery*, 117 F.3d 723, 727 (3d Cir. 1997)). Thus, like the single employer test, "control is the central issue." *Blagg v. Technology Group, Inc.*, 303 F. Supp. 2d 1181, 1185 (D. Colo. 2004). "Most important to control over the

terms and conditions of an employment relationship is the right to terminate it under certain circumstances." *Bristol*, 312 F.3d at 1219.

"While the single employer test looks at the overall relationship of the two entities, joint employer status is determined by focusing on the entities' relationships to a given employee or class of employees." *Sandoval v. City of Boulder*, 388 F.3d 1312, 1324 (10th Cir. 2004). Accordingly, for BSA to be liable for DAC's decision to terminate Plaintiff, Plaintiff must show that BSA and DAC were joint employers of the position from which Plaintiff was terminated: "Class 7" Field Director. *See id.*

In his argument regarding BSA and DAC as joint employers, Plaintiff recites the same set of facts as those purportedly supporting his argument regarding BSA and DAC as a single employer. Again, the proffered evidence—when construed in the light most favorable to Plaintiff—merely shows BSA provided training, support, and non-binding guidelines to assist DAC in making human resources decisions. Plaintiff directs me to no evidence showing BSA had any impact on DAC's decision to terminate his employment, nor any evidence showing BSA had any ability to influence such a decision. Plaintiff proffers no evidence showing BSA could have forced his removal nor any evidence showing BSA determined the essential terms and conditions of his employment. *See Sandoval*, *supra*, 388 F.3d at 1324. Accordingly, Plaintiff's arguments under the "joint employer test" fail for the same reasons as his arguments under the "single employer test." *See Sandoval*, 388 F.3d at 1324; *Emerson v. Wembley USA, Inc.*, 433 F. Supp. 2d 1200, 1221 (D. Colo. 2006).

## B. Retaliation Claims

To establish a *prima facie* case of retaliation, Plaintiff must show (1) he engaged in a

protected activity, (2) he was subjected to an employment action that a reasonable employee would have found materially adverse, and (3) there was a causal connection between the protected activity and the adverse employment action. *Argo v. Blue Cross & Blue Shield of Kan., Inc.*, 452 F.3d 1193, 1202 (10th Cir. 2006); *Gunnell v. Utah Valley State Coll.*, 152 F.3d 1253, 1262–63 (10th Cir. 1998). The test is the same under Title VII, 42 U.S.C. § 1981, and the ADEA. *Somoza v. Univ. of Denver*, 513 F.3d 1206, 1212 (10th Cir. 2008); *Sanchez v. Denver Pub. Sch.*, 164 F.3d 527, 533 (10th Cir. 1998). It is not disputed that Plaintiff meets the first element of his *prima facie* case.

Somewhat curiously, Plaintiff does not appear argue the third element—"causation"—at all. Standing alone, the four-month period between April 15, 2005—the date Plaintiff alleges he placed DAC, and presumably BSA, on notice he believed he had been illegally terminated due to his race/color/national origin, age, and seniority—and BSA's "August or September" 2005 decision to stop searching for a new job for Plaintiff would generally not be sufficiently proximate to show causation. *See Proctor v. United Parcel Service*, 502 F.3d 1200, 1208 (10th Cir. 2007) (discussing cases). Tenth Circuit precedent, however, allows the causation element to be satisfied where—as here—the later-occurring actions are part of a pattern of adverse actions commencing at a more proximate date. *See Steele v. Kroenke Sports Enters., L.L.C.*, 264 F. App'x 735, 746 (10th Cir. 2008). Accordingly—for purposes of this summary judgment motion—I will assume Plaintiff meets the causation requirement for those allegedly adverse actions taken subsequent to April 15, 2005.

A review of the claimed retaliatory actions, however, shows that even under the "pattern of adverse actions" standard, many of the allegedly retaliatory acts could not have been "caused"

13

by Plaintiff's decision to pursue his discrimination claims because they occurred prior to Plaintiff engaging in a protected activity. *See Jones v. U.P.S., Inc.*, 502 F.3d 1176, 1194 (10th Cir. 2007). Accordingly, the following—all of which occurred prior to April 15, 2005—cannot amount to retaliation: Plaintiff's claims regarding his Priority Move status between 2002 and March 15, 2005; Plaintiff's claims regarding the hiring of Charlie Arbogast on March 7, 2005; and Plaintiff's claims regarding the hiring of Jim Machamer and Nathan Baie on March 11, 2005. *See Steele*, *supra*, 264 F. App'x at 746.

The remaining "adverse employment actions" allegedly taken by BSA include: (1) BSA's only sending Plaintiff's application to five local area councils; (2) BSA's cancelling of Plaintiff's access to BSA's intranet service "ScoutNet"; (3) BSA's decision to desist in its job search assistance in August or September 2005; and (4) BSA's failure to notify Plaintiff of new positions in DAC in June 2005. Even when construed in the light most favorable to Plaintiff, however, none of these actions is sufficient for Plaintiff to show a genuine issue of fact whether BSA acted toward him in a way that a reasonable employee would have found materially adverse. Accordingly, Plaintiff fails to make out his *prima facie* case and summary judgment is appropriate.

*1. BSA sent Plaintiff's application to five local area councils*

Plaintiff's evidence shows local councils are required to choose candidates for a commissioned professional position from a list provided by the BSA Chief Scout Executive when the available position is "Class 9" or higher. Rankin Depo. 100-01 [**Docket # 106-10**]. For positions of "Class 8" or below, the list is provided by the regional office. Rankin Depo. 101 [**Docket # 106-10**]. While local councils occasionally receive direct applications for

available "Class 8" or lower positions, the regular practice was to contact the regional office for approval before hiring. Rankin Depo. 102 [**Docket # 106-10**].

Plaintiff's evidence shows BSA sent Plaintiff's information to Columbus, Chicago, Dayton, Kansas City, and Baltimore. Although Plaintiff claims BSA's efforts on his behalf were substandard, he provides no evidence showing his treatment was any different from that afforded other similarly-situated "Class 7" commissioned professionals. *See Somoza v. Univ. of Denver*, 513 F.3d 1206, 1216–17, 1219 (10th Cir. 2008). Accordingly, Plaintiff's evidence does not show BSA acted toward him in a way that a reasonable employee would have found materially adverse. *See Steele, supra*, 264 F. App'x at 746.

### 2. BSA canceled Plaintiff's access to BSA's intranet service "ScoutNET"

Plaintiff's evidence shows that all Boy Scout employees' access to ScoutNET "should be immediately" deactivated "upon the date of termination." Morin Depo. 27–28 [**Docket # 106-9**]. Accordingly, the evidence does not show canceling the ScoutNET access was an adverse employment action attributable to BSA.

### 3. BSA stopped looking for new placement in August or September 2005

Plaintiff's evidence shows that when—as here—a commissioned professional is terminated for budgetary reasons, the regional BSA directors would "aggressively try to find placement for that person" by sending the commissioned professional's records to any local council in the region that had an appropriate vacancy. Chandler Depo. 42–44 [**Docket # 106-4**]. Although there is no official policy for how long this "aggressive" placement would continue, it generally lasted from four to six months. Chandler Depo. 45–46 [**Docket # 106-4**].

In Plaintiff's case, the evidence shows BSA began looking for new employment for

Plaintiff "shortly after" March 11, 2005. Rankin Depo. 62–65 [**Docket # 106-10**]. BSA spoke

with Plaintiff "on a weekly basis." Rankin Depo. 65 [**Docket # 106-10**]. BSA stopped looking

for a position in August or September of 2005. Rankin Depo. 84–85 [**Docket # 106-10**].

Contrary to Plaintiff's assertions, this time period is the same as that afforded other employees.

Moreover, Plaintiff's testimony shows BSA stopped looking for positions because Plaintiff "just

stopped calling." Rankin Depo. 85 [**Docket # 106-10**]. Plaintiff provides no evidence showing

he was treated any differently from any other commissioned professional and no evidence

showing a reasonable employee in his position would have found the five to six month period to

be materially adverse.

### 4. BSA failed to notify Plaintiff of new positions in DAC

In June 2005, DAC hired a new Director of Finance Services, Thomas Gonzalez, a new

Development Director, Catherine Zanotti, and a new Director of Field Service, James Hans.

Plaintiff alleges he was never informed that these positions became available. The only evidence

presented on BSA policy regarding placing commissioned professionals with the same local

council from which their position was eliminated, however, shows that Mr. Rankin—the

regional director of the Western Region encompassing DAC—indicated to Plaintiff that he

should contact the DAC directly to apply for available positions in accordance with BSA's

regular "open-door policy." Rankin Depo. 127–32 [**Docket # 106-10**]. The evidence—although

it shows Plaintiff was considered for and generally aware of the available positions—does not

show Plaintiff made any effort to pursue the positions directly. Rankin Depo. 128–33 [**Docket #

106-10**]; Aludo Depo. 125–26 [**Docket # 111-6**]. Plaintiff points me to no evidence showing his

treatment by BSA in this regard was any different from that afforded other commissioned

professionals and no evidence showing a reasonable employee in his position would have found BSA's actions to be materially adverse.

## V. CONCLUSION

Plaintiff fails to show a genuine issue of fact whether BSA and DAC were acting as a single or joint employer with regard to his position. Accordingly, summary judgment as to Plaintiff's termination claims is appropriate. Plaintiff also fails to meet his *prima facie* burden under a retaliation theory because he fails to provide evidence of any act on behalf of BSA that a reasonable employee would consider materially adverse. Accordingly, Boy Scouts of America, National Council's Motion for Summary Judgment [**Docket # 60**] is GRANTED. Plaintiff's claims against Defendant Boy Scouts of America, National Council, are DISMISSED. Defendant Boy Scouts of America, National Council, is AWARDED COSTS.

Dated: August __5__, 2008.

BY THE COURT:

    s/Lewis T. Babcock        
Lewis T. Babcock, Judge